Thank you, Judge Fletcher. May it please the Court, I'm Michael Madden, appearing this morning on behalf of Experience Hendrix and Authentic Hendrix. These are companies that were formed by Al Hendrix, Jimmy Hendrix's dad and sole heir, in order to manage and commercialize intellectual property rights associated with Jimmy Hendrix. There are a number of issues that have been raised on appeal and cross-appeal, more than I can effectively address even in the 20 minutes you've allotted to us. So I'd like to focus my argument on two of the issues. The first being Judge Zille's ruling on the constitutionality of the 2008 amendments to the Washington Personality Rights Act, which we call WIPRA. And secondly, the district court's ruling on the post-trial motions where he reduced the, or took away most of the jury's verdict. On damages, the damages issue. Correct. He didn't do any reversals of the jury's verdicts on who's liable, he just took, he just took the damages. Liability was determined on the Lanham Act on summary judgment and the jury found liable. Just the damages. On consumer protection, correct. On the WIPRA issues, we believe the district court should not have reached the constitutionality of the act because there was no evidence of any actual or imminent activity by the defendants that would be subject to a WIPRA claim by experience. Experience never made such a claim. So is this a ripeness argument that you're asserting? Well, it's a standing issue purely. Ripeness, I think, is a matter of timing. And let me try to explain a little bit, if I might, relative to the procedural history. While experience's motion for preliminary injunction on the trademark claims was pending, the defendants made a counterclaim in which they alleged that experience was stopped by this court's decision in the foundation case from asserting any rights under WIPRA. And the justification that was offered for that claim was, well, look, I might win these trademark claims. And if I do, experience is likely to go ahead and make claims under WIPRA based on the same activities. Of course, then the district court went ahead and granted an injunction against all of the infringing activities. And the defendants, in fact, said they'd abandoned those activities. Their companies had gone out of business. And so the rationale that had been advanced for the WIPRA counterclaim seemed to us to have vanished. And we sent discovery in order to confirm that and asking for the factual basis for the counterclaim. And the answer was, it's the same facts as underlie the trademark claims. So we said, well, okay, those have been enjoined and you're out of business. Well, is the only relief sought under WIPRA, if that's the right way to do the acronym, only prospective? Yes. Yes. He sought a declaration. Well, the right is only prospective. The district court is quite content to give prospective relief in the other direction. I'm not sure I quite understand the right in a standing problem from your standpoint. Well, the problem is the district court said, look, that the plaintiff, you know, at this point he's abandoned the infringing activities under our trademarks. But he says, you know, if you would tell me that I could judge under WIPRA, I have these images and likenesses of Jimi Hendrix that I would like to market. He said that one place and one place only in a brief. But that doesn't sound like abandonment. That sounds like this is what I want to do. I'm just going to prudently put it off until we get a ruling on it. Well, but here's the problem. The district court hinged its standing ruling on the Supreme Court's MedImmune case and said, look, you know, under MedImmune you don't have to show a person who wants to challenge another party's intellectual property rights doesn't have to show an actual threat of litigation by the rights holder. The problem is what MedImmune didn't do is it didn't do away with the well-established test in intellectual property cases. And I think the Federal Circuit's ScanDisc case is the leading example. But there are identical precedents in this circuit that says you as the challenger have to show that you actually are or you're imminently about to engage in infringing activities. And on summary judgment, you have to show that by evidence. Well, wasn't Hendricks Licensing doing some transactional work with Spencer Gifts? All infringing activities, all activities that involved are registered marks. But wasn't, my question again, wasn't Hendricks Licensing, some of its products being marketed through Spencer Gifts? Yes. Okay. And so if there was a WIPRA problem, arguably that would cover those products trademarked potentially or at least WIPRA-protected documents, materials. Those activities had been enjoined. They had ceased. But they never said that we are never going to go back into that business, did they? He never said that he was not contemplating going into some infringing activity. But the difficulty is in order to evaluate whether, for example, there really is a WIPRA controversy here, you need some facts. Well, but the facts we have are that Hendricks Licensing was selling products through Spencer Gifts, and arguably those products were in violation of experienced Hendricks rights under WIPRA. I cannot tell you. That's one of the problems. I can't tell you that. We never did that analysis. Our analysis was limited to these products that he's selling. Well, if you never did that analysis, then how can you affirmatively be arguing to us that it's not, that there's no standing or that it's not ripe or something? I'm arguing that there's no standing because there was no showing that as of the time of summary judgment that the defendants were engaged in or about to engage in any infringing activities. They were out of business. Essentially, under the district court's ruling, anyone with an interest in marketing Hendricks-related merchandise could sue us and say, look, you don't have any rights under WIPRA. If I might, I'd like to just turn to the merits of the district court's ruling. The district court ruled first that under the due process and full faith and credit clauses, that essentially all of the 2008 amendments were invalid on their face. And as I said, the problem the district court got into, I think, was infected by the lack of an actual case or controversy because under the Supreme Court's case law, which is primarily reflected in the Hague and Schutt cases, the court is supposed to look at whether in the circumstances of a specific case, the forum state has enough contacts, individual or in the aggregate, that it's not fundamentally unfair or arbitrary to apply that state's law. And if in an individual case it concludes, the district court was to conclude that it was unfair to apply Washington law, WIPRA, the remedy is don't apply Washington law in that case. Let me ask you about that because, you know, there is this concern about whether the Isle of Tobago can control the, you know, the jurisprudence of the world. But out of this ruling, wouldn't this ruling only be limited to transactions in the state of Washington? Well, one of the flaws in the district court's ruling, we argue, look, this statute doesn't have direct extraterritorial effect. And the district court, I think, recognized that if that was true, its theory was problematic. And so it interpreted the statute in two hypothetical ways that I think are wrong. First, and I have a 90 percent chance of saying this word wrong incorrectly or mispronouncing it, it applied the doctrine of or hypothecated that a Washington court in a different case could apply the doctrine of decipage to borrow another state's infringement provision and add on to that Washington's scope provision. So Washington has a broad scope and then might apply California's infringement position and put those two together. But whether or not Washington does that is up to Washington for transactions in Washington. But in this particular case, if Hendricks Licensing is selling products in Ohio, Hendricks Licensing is going to have a new crack at whether that's legal or not, and the WIPRA decisions in Washington aren't going to control that Ohio decision. Isn't that right? Do you agree with that? I agree that WIPRA does not have extraterritorial effect. Then there's nothing in the decision that you're appealing that would be contrary to what you and I and Judge Rawlinson have just stated. No, but the difficulty is essentially what the district court's decision means, and it's a district court decision, but if it becomes precedential, what it means is our law is unconstitutional, Indiana's law is unconstitutional, Nevada's law is unconstitutional. But Indiana and Ohio and Wyoming might disagree with that. They might, but what this does is it rather than decide a case and say in this particular case it's unfair, it's so unfair as to violate due process to apply Washington's statutory choice of law directive, that you can't do it. You must apply the law of some other state. But doesn't Washington, within due process limits, get to decide how it's going to apply its choice of law provisions? Absolutely, except the district court here struck our choice of law provision, said it's unconstitutional. And it did it based on, first of all, what it said was our inability to show that every hypothetical celebrity who died in another state, or strike that, let me rephrase that, our inability to show that Washington had an interest in enforcing its law with respect to any hypothetical celebrity who died in another state. Not Jimi Hendrix, because with respect to Jimi, New York, which is his state of domicile at death, has no particular interest. New York has never passed on whether Jimi Hendrix had personality rights or whether they survived his death. At the time he died, the federal courts in New York said that he did. And it wasn't until years later that the New York state courts reversed course. So these things are variable, flexible. We see this law change all the time. And if you consider this hypothetical, I think it shows where the district court went awry. It thought that, look, applying the law of domicile makes perfect sense because it's simple to determine, but it's not. What practical effect did the court's ruling have on this particular case? Well, none because there was no case. There were no activities of these defendants. They ceased their activities because of the injunction.  Jimi Hendrix's personality rights are now in play and stirs up parasitic activity designed to capitalize on Jimi's image, which is, you know, extremely valuable, and which Washington had an interest in fostering that. And I think, you know, these are Washington companies. There are other companies in Washington engaged in this business. And if you consider, you know, Washington may want to attract celebrities or individual or the businesses associated with commercializing intellectual property rights for celebrities, and you consider, you know, whether it's an entertainer or a sports star, lives in Seattle, comes to stardom in Seattle, forms companies in Seattle, is successful at commercializing their image, and then for whatever reason later in life moved to New York and get run over by a bus, under the district court's ruling, those rights are gone. And I think that is more arbitrary and unfair than the rule, than the problem the district court was trying to prevent. And in addition, you know, beyond policy, if we turn back to the Supreme Court precedent in Haig, Haig is a case venued in Minnesota involving a death of a Wisconsin domiciliary in Wisconsin involving the interpretation of a Wisconsin insurance policy. But by the time the litigation was brought, the widow had moved to Minnesota. And the Supreme Court said, you know, Minnesota can apply its own law, which was more favorable for the widow. But under a Supreme Court precedent, quite clearly domicile is not controlling. Well, under both Haig and under Phillips Petroleum, the Supreme Court is extremely lenient in allowing states to apply their own laws with respect to full faith and credit insurance. That's correct. That's correct. They're very, as I said, I think, modest limits. I want to also briefly, well, I should touch on the Rule 50 rulings. What happened here is the district court took away the lost profits award because it believed that the award represented gross profits, not net. And because it also took away the damages for injury to experiences, reputation and goodwill because it thought they were inadequately quantified. With respect to the lost royalty income, one of the things that's most troubling here is the district court based part of it, based its decision in part on the notion that there was no proven causation between the reduction in royalty income from 2008 to 2009, the period encompassed by the infringing activities, and speculated that the reduction was because of the 2007 foundation decision, which of course said that under the prior Washington law, Jimi Hendrix's personality rights did not survive. What is our standard of review? I mean, when I looked at this evidence on damages, it was very, very light. That is, the confusion between evidence that went to net profits and lost profits and gross revenues and expenses and how much was attributed to a bad economy and how much was attributed to a suit and everything else and how much attributed to action. There was just no effort to be precise about any of it. So when the district court said it's just not good enough and I'm going to reduce it, what is our standard of review of the district court's decision? It's de novo, Your Honor. Okay. I think the problem is, I would characterize the evidence as clean. On the lost profits issue, it's royalty income. The jury heard that the licenses that led to the royalties were established long before. The spreadsheets were set up to show gross profit, net profit, with no difference between the number. The jury was entitled to infer, and common sense tells us, you know, there are not necessarily fixed costs associated with licensing agreements that are in place. Similarly, the district court made, I think, a grievous error when it, on its own, came up with the argument that there wasn't causation because of the intervening foundation decision because Mr. Bob Hendricks, when he testified in his Exhibit 60A that he created, he only calculated damages based on lost trademarked revenue, which would have nothing to do with intellectual property rights. You know, this is not something that's been part of the oral argument, but it troubles me a little bit. I mean, we've got two domain names that are, in the view, in your view and in the view of the jury and the district judge, are infringing. But under the nominative fair use doctrine, I'm not sure that I agree with respect to the Hendricks artwork. Why is that infringing? That is to say, you read Judge Kaczynski's opinion in the Toyota case, and so sort of starbucksgossip.com or Mercedes fans and so on. So Hendricks artwork, I mean, this just doesn't say Hendricks or Hendricks licensing, which may well, and I'm with the district court on that one, that sounds like nominative fair use. It sounds like it's not nominative fair use, but Hendricks artwork may be. Help me understand why that's infringing. The difficulty goes back to this. The defendants told the district court at the time that they were not going to challenge the injunction, which included enjoining the use of these domain names. So they never raised that. What the district court found was this is not a nominative fair use because it doesn't refer to your products. It's referring to infringing products. And that was the only record before the district court, is the only thing associated with that domain name was infringing products. It was like the Toyota case if you took a Kia and put a Lexus logo on it. The second thing is that the defendants didn't challenge and haven't challenged Judge Zilley's sleep craft analysis where he found that there was a likelihood of brand confusion because of what they were doing. So I think for that additional reason, the cross appeal goes nowhere. So just so I understand, so if Hendricks had actually painted some paintings and they were describing those as Hendricks artwork, that would be a nominative fair use because it would be describing paintings by Hendricks. But if they made the paintings and said Hendricks artwork for paintings they had made, then it would not be a nominative fair use. Is that fair? In the time I have, yes. And to be clear, though, the other part of the district court's analysis was that the way that the defendants were conducting their business and using these domain names led to brand confusion with our domain names, which are very similar. And that finding has not been challenged. Okay, let's hear from the other side, and we'll give you a minute to respond. Thank you. Good morning, Your Honors, and may it please the Court, excuse me, I've had about half a voice here for a couple of weeks, which is odd for me when normally I'm quite loud. Thomas Osinski, Jr., on behalf of Hendricks Licensing and actually Pizzicalis, as it's referred to in the briefings. Andrew Pizzicalis was the chief owner of the company's Hendricks Licensing. Let me cover a few issues where there are disputes about what the reality is in the record. First and foremost, I think we need some clarification here. At no point did Mr. Pizzicalis abandon all business. It's within the record. I'm sorry to not have the exact site to the excerpt, but there are declarations from him. It is within Judge Zilli's opinion, talking about Spencer Giff's transactions were brought up earlier. All that was stopped was the particular use of the Hendricks, the domain names that said Hendricks on them, the signature, and a logo that he created. And those are the elements that were later found to be infringing in a summary judgment order on which the trial on damages was about. So to the extent that the standing argument anyway trends on the idea that all activity had ceased, and there was no evidence on the record of it ceasing, that's not true. Again, I would indicate to Judge Zilli's opinion of February 8th, 2011, where he discusses in a footnote, which I don't have handy right now, the takings argument. He talks about the idea that there's factual disputes about how much artwork's been commissioned, what's continuing to go on, et cetera, but in no way indicates the idea that somehow there was a complete secession of activity. Mr. Pallis's Cancellation Company, which is actually in connection with Leon Hendricks, Jimmy's brother, has gone ahead and continued to produce T-shirt posters, fine artwork, et cetera, including, in fact, coming to your question, Your Honor, some licenses for some original pieces of artwork created by Jimmy Hendricks. He actually has a license to 46 pieces of work. That's deep in the record. The record showed that Hendricks Licensing was engaged in some of this marketing activity in other states? Yes, absolutely. Even throughout the litigation? Other states and even actually worldwide. Throughout the litigation? Yes. For a piece of clarity, what ended up happening is once he voluntarily abandoned, before the injunction, the domain names, changed and created a new business that didn't use the name Hendricks, didn't use the domain Hendricks, transferred all the assets over, continued to do work. What was the name of the new business? That company was called Rockin' Artwork, and since that really didn't come up until trial, that's not necessarily in the records because the standing issue had been long settled before trial, so there was no reason getting it. That's why it's not necessarily before you here. I just want to make sure I understand. So Hendricks Licensing is still doing business but now under a different corporate name? Correct. And under the name, under the corporate name of Hendricks Licensing, are they doing business anywhere now? No, that was voluntarily seceded. But he says voluntarily. He's never made a declaration, I'm out of business, I've shut down the company, I've abandoned it and will never do business again. No, absolutely has not. And also let me point out that Mr. Pizzicalis was sued personally through this entire, so he is kind of the common thread amongst both companies. He's the majority owner of both. So when he says either I have or those almost are nom de plumes, for lack of a better term, corporate entities that represent his activities, and his activity was constant. So that said, and I'm happy to discuss the standing issue more if you want, other than simply the fact that I would also point out, as the district court goes into, issues about trading on Jimi Hendrix's fame, on his reputation, the fact that he was a famous rock star, et cetera, are part and parcel of the complaint itself. And as the district court reasoned, those are beyond trademark rights, those are publicity rights. Even though the WPRA itself was never sued under, it was actually, it was in play, the issues were in play. Help me understand the degree to which and the manner in which WPRA is in play. I mean, I'm inclined to think that Judge Zille got it wrong. That is to say, if we're talking about as applied, I think there are certain ways in which it clearly could be applied constitutionally. But if we're talking about as applied, a judge ordinarily likes to know some facts. So it's applied to what? So the argument partly is, well, there are insufficient facts on which a judge could address or decide an as applied challenge. Help me out on this one. Yeah, I can give you a perfect example. Actually, in the other side's brief, there are some illustrations of their marks. There's also, I think it's page four, excuse me if I'm slightly off, but it's right at the beginning. You'll see a Jimi Hendrix blacklight poster, one of my client's products. It was also, you'll see it in the preliminary injunction opinion that shows up as a graphic. That was kind of exhibit A to what's viable and what's not. And for that preliminary injunction hearing in July of 2009, it was used, and this was an image of Jimi Hendrix, a signature, and a logo, and the domain names were listed. And what the discussion came out of it was, if you removed the Jimi Hendrix signature, the logo, the small logo, and the domain names, that looking at a product like this, an image of Jimi Hendrix that says Hendrix on it, identifying who's in the poster, was perfectly viable. That was, say, fourth in the July, I want to say second, 2009 preliminary injunction opinion. In the February 8th document of 2011, the same one where the statutes were found unconstitutional, that law was also applied to say that those are no longer preliminary rulings. Those are my rulings for those same reasons about the use of nominative fair use, to be able to use the names Hendrix and Jimi Hendrix, and to go ahead and continue to use his image and likeness in products, that they have no bar to that. So that's where the WPRA comes in. And I'm a little deaf, so help me out. So how does WIPRA fit into that scenario or minor rulings you just gave me? Because if WIPRA was found to be enforceable, if, because, and I can get a little bit to the merits on this later, which is about the domicile, which is what we argue it turns on. If WIPRA was found to be enforceable, Jimi Hendrix's image and likeness would become the property of experience. So even the posters in those, the poster in those rulings I just described, with an image of Jimi Hendrix in his name, Hendrix or Jimi Hendrix, would not be allowed because his name, image, and likeness, as well as the sound of his voice and some other elements under WIPRA, would become the property of experience, and those products at minimum could no longer flow into Washington. Or at least could, depending on the application of the statute. Absolutely. If they were not within the limited fair use, the limited fair use limits in WIPRA. But what about transactions completely outside of Washington? Well, then that's the, I think you're absolutely right, that theoretically WIPRA couldn't meet that. But the question becomes, what the judge did point out is that the advertising elements didn't necessarily, they looked like they could apply extraterritorial. He also pointed out that the charitable contributions could apply extraterritorial. But also, your honor, I think where it begins to affect outside is, that goes, if I'll jump to substance at this point, the dormant commerce clause argument, which is the idea that in an issue of when you sell to national retailers, you have a national advertising program, you have a web presence. This was also part of this. That is something national in scope. And so to carve Washington State out here, this is an island wherein Jimi Hendrix's rights flow freely in the 49, or in the case of Indiana, which was valid at the time. It's actually no longer applies that far retroactively under Seventh Circuit law. Those 48 states, the other 48, those other 48, Jimi Hendrix would be viable, but not viable in these two. The judge said reasonably we can say that interferes with the stream of commerce. It interferes with national advertising, national marketing, signing national chains, et cetera. How was the challenge to WIPRA expressed? Was it expressed as a facial challenge to WIPRA, or was it expressed as an as applied to these facts in this case, facts of which critically related to Washington or we wouldn't have had jurisdiction? I listed them as an act. I actually presented it as an as applied. There's a footnote in the 2008 decision where the judge discusses this, and he says, but his take on the matter was if it applied to Jimi Hendrix, it applied to everyone. But you presented the case. The case was articulated and expressed as an as applied case. Yes. Although the district court, when it was giving kind of a parade of horribles, really looked at it more as a facial challenge. Yes. It's absolutely true, and that came up during oral argument. And that actually leads me, Your Honor, to my next portion of the substance, which is the issue in our opinion, I think, of the district court side, is we're not talking about the act of the infringing product coming into Washington, the prospective act or that current act. The occurrence that matters for analysis, for constitutional analysis, under the full faith and credit due process portion of the issue, was the death of Jimi Hendrix while he was domiciled in New York in 1970, as established by the foundation case. Why was that the triggering event, particularly given the amendments to the Washington law, to Whipper's law, saying the death is not a critical event? Why should the death be a more important event for forum determination? Right. Than the actual commercial transactions in the state of Washington? Because whether or not the commercial transactions can be illegal requires a right to have descended to someone asserting it. Experience. It will affect the Washington residents. Right. And those, the right that you are now tracing back through Hendrix's death in New York, that right depended on a whole bunch of things. It depended not only on maybe where he died or whether, in fact, he died, but it depended on whether he created the song or created the music. It depended upon whether he made contract licensing agreements to it or whether there's a likeness, whether people were deceived. So that was just one of many, many factors you're going to have to look at for a lawsuit. I think that's true, for one, about certain various rights that passed from Jimi Hendrix to his heir, at the time Al Hendrix, and then later to experienced Hendrix. But for the publicity right itself, that's very finite. It's very narrow. We would argue, and I think the district court saw it as, the question was, did Jimi Hendrix, when he passed away in 1970, where was he domiciled? They looked to that, New York. New York had no posthumous right of publicity, and as a result of no posthumous right of publicity, there was no right to descend. So is your argument that at that moment the right was extinguished and nothing that Wyoming or anybody else could have done could resurrect it or breathe Lazarus' life into it because it was dead? That is absolutely our position. So that had Washington's amendment been in existence before Hendrix died, you might be in a different position, according to your argument? Yes, if Washington, but again, the question would be what was Washington's connection to Jimi Hendrix at the time that he died? No, I'm not saying that you don't have additional arguments, but I'm saying that one of the main arguments you are relying on is to look at the law as it was frozen in time when he died, and at that point you say his rights were fixed in time at that point. Yes. You would not have that argument. You would not have that argument to make if the amendment to WIPRA had been in existence at that time. Or WIPRA itself, because WIPRA didn't exist until 1998. Yes, I would agree with that. And what I also want to say in addition to that analysis is this issue was looked at, that's what the foundation case looked at. It looked at what law to apply, decided that when New York law is applied, there is no right that descends. That came to before this court, different panel in 2007, and was affirmed that there was no descendable right of publicity. 2008, the WIPRA amendments are put in, and domicile is removed from all portions of it. And with domicile removed, then it became a way to revisit it and say, well, then maybe yes, Washington's law can apply, but it is being asked to apply retroactively and to an occurrence or transaction, a death in New York, to which Washington State had almost no effect. I think what Judge Zille looked at it as, and what we would agree with, is the idea that what happens is you have Washington State deciding to do something completely different with a New York citizen than New York has either decided to do at the time or even currently, so to speak. And doing it not just with New York citizens, but citizens of the other remaining 49 states. This may be cutting it pretty fine, but at the time that the Washington statute was amended, so into its current form, so that domicile is out of it, and it's a very explicit, broad-reaching statute. Yes. And I understand Jimi Hendrix died intestate. Yes. Was his estate settled at the time that statute was amended? Yes, it was. So as far as that estate was concerned, it was finished? Yes. That information, if it's not directly in this portion, it's within that foundation line of cases cited to you within the briefing and within Judge Zille's opinions. But the record supports that? Yes, it supports that condition. I'm saying that I don't have a copy of the New York probate court ruling. No, but in the record we would find evidence about that being resolved. Yes, that his estate was settled. Everyone agrees that he died intestate. Al Hendrix, his father, being his only heir, absorbed all of his property because he also had no issue at the time, and that's well settled and has been for 30 years. And under intestate law of New York, a surviving parent takes and siblings, if there is a surviving parent, do not. Yes. That must be right. Yes. Now, this is, I think, not relevant to the merits of the lawsuit, but I'm just curious. Are there any Hendrix family members still financially involved and have any stake in this lawsuit? The experienced Hendrix is ran by, and this is in the record, Jeannie Hendrix, who is the adopted stepdaughter of Al. So she was Al after remarrying again after the divorcing or the passing of Lucille, Jimmy and Leon's father, and Jeannie, and then later adopted Jeannie. So she, by legal connection to Al, she runs Experience. That's my understanding. So the family members, to the extent that they're attenuated, but still the family members are all on the side of Experienced Hendrix. No, that's not correct, because Leon Hendrix's brother is associated with Experienced Hendrix. Passed through to Hendrix Licensing, yes. Yes. And is the brother, Leon, associated then with the other side? Yes. Leon's associated. And he's still living and has financial stake? Yeah, absolutely, not to go too far into the weeds, but there was a well history of a will contest and some other things. Right. But try to focus on what's before us. Don't go too far into those weeds. Exactly. Or the Hendrix voodoo, as I've been told. No, we can guess at the complications. So with that said, I just want to touch lightly on, since I think we've only got a few minutes left, just to the extent of the reduction issues, there's just two main points I want to point out. And I think it's very, again, you know, Zilli was very clear about this, but I want to underline it. The idea that there was no evidence of costs. All that was presented as far as the plaintiff's lost profits were gross revenues. And the court was clear, wasn't he, that the court wanted net profits or costs plugged in to the evidence. Yes. The court said that's what we're dealing with here. Yes. So that they knew what the bar was. Yeah, I think so. And I think the point could be that, and it's to an extent to this idea about loyalties being clean or fixed overhead or passive income as covered in all the briefing, but the problem we're dealing with here is a complete lack of evidence on that issue. There's no discussion of it. When those statements were made, I heard your opponent make those statements. Were those made in briefing and by lawyers in argument, or were those statements made by evidence in the court? Those were made in briefing and argument by the attorneys as part of the 50B in this appeal. So as opposed to evidence admitted into the court. Yes. Yes. And so then the second half of that is this issue about the speculation around the goodwill and reputation damages, and the goodwill and reputation damages. One, we have an agreed, there was an agreed jury instruction. All lawyers were present when the question was set out that for the purposes of this case, reputation and goodwill should be treated the same, however it was presented as 300 and 750. Yes, that evidence was, and I bring that as a segue back to this issue of what was or wasn't raised orally, that's the only thing that couldn't be raised orally, because we didn't know until the jury verdict came in. But prior in the oral argument, it was raised that there was no testimony about how much damage was done to the goodwill or done to the reputation. Professor Yulf said there might have been damage. John McDermott talked about efforts to create goodwill. Let me revisit, if I can, this question of net profit and costs and so on. I mean, as I understand Judge Zille's thinking, it is that the plaintiffs were on notice that they had to present sufficient evidence of the actual loss, not just loss of gross revenues of some kind. And because they were on notice that they had to provide it, and then they didn't provide it, he was going to say, well, I'm just going to disallow it. Is that right? Is that Judge Zille's thinking on that? I think that's fair. I think it may be a little bit more formal than that, but at its core, I think that's a fair position. And at what point was there any sort of explicit discussion by Judge Zille or by anybody else of saying, well, you know, this evidence that you're presenting as sort of net royalties or whatever doesn't include any acknowledgment of the possibility of costs and so on, and this evidence is insufficient? According to Judge Zille, and I don't have the exact site, there was discussion of this in the instructions, and although I lived through the trial, this is going to have perfect recall of everything. But I'll refer to that being in the record in the September ruling, the 19-page ruling. I'll also point out that absolutely my express recollection of this would have been in the 50B oral motion before it was submitted to the jury. And how about when the evidence was coming in? Was there cross-examination that challenged and said, well, this is not net profit. This looks like lost revenues, not lost profits. I can see that there wasn't cross-examination on that, but for what it's worth, for one way or another, there's a certain extent to which what side are we required to do, the other side's lawyering, and I was always taught if the other side's self-immolating, get out of the way. Yeah, but the word net suggests that costs have been deducted. But there wasn't a discussion, I think, of it as net or not. It was a discussion of profits. It was a discussion of revenues. And so the idea of it being net were that it was presented as net, so to speak. It was just presented as losses. But without losses, without specificity. So I think with that, Your Honor, I will say thank you very much. Thank you. Why don't we start with three minutes on the clock and see what happens. Thank you, Your Honor. Let me turn back to the foundation case. The issue in the foundation case was whether the pre-2008 version of WIPRA contained a statutory directive to apply Washington law rather than the law of New York. This court concluded that WIPRA did not. Now, the issue, I think, that's neatly framed up by the appellee's argument is, is there any constitutional provision or principle that prevented Washington or any other state from changing its law? Washington did change its law to include and express statutory directive. And in this case, the district court said it's facially unconstitutional. You'll see Judge Zilley's. Judge Zilley, facially unconstitutional as applied to several states out of New York. Well, I think he said it's facially unconstitutional as to any non-domiciliary deceased celebrity. And this was pre-amendment? This is post-amendment, that in this case. And the difficulty I have is, you know, facial constitutional challenges are And Judge Zilley has a lengthy footnote. I think it's in the excerpt of record at page 61, note 22, where he was not happy with the defendant's position that this was an as-applied challenge. Because, of course, if it's an as-applied challenge, you don't have any facts. We're not going to get there. And you see that reflected when Judge Zilley declines to decide the other constitutional claims that were advanced, saying there aren't adequate facts in order for me to decide. With respect to facts, is it true that we can find in the record in a way that we can take into account that at the time the Washington statue was put into its current form, the estate had been settled? I don't think you can find that in the record. I mean, the difficulty, and this goes to the heart of the district court's theory about how domicile is uniform and easy and, therefore, it's required to be adopted. It's in the attraction of the rule. But when Jimi Hendrix died and when his estate was closed, the assumption in New York law amongst knowledgeable people was publicity rights pass. And there were transactions entered into by Al and the companies on that assumption. And then New York law changed. You have a similar situation in California, where California didn't recognize posthumous rights. Now it does. And so you see in the Marilyn Monroe case where people, her estate was probated in New York because it was favorable tax-wise, that later the company comes back and says, well, you know, she really was domiciled in California. And I think I've about used my three minutes. I do want to say, answer the question, that the defendant's halftime motion was wholly inadequate. It didn't call out any of the reasoning that was advanced by the district court. And, in fact, the causation argument that the district court used in part was the district court's own argument. We never even had a chance to respond to it. The first we heard of it was in the order. Okay. Thank you. Thank both sides. Interesting case. Experience Hendricks v. HendricksLicensing.com, submitted for decision. And that completes the calendar for this morning. Thank you.
judges: Ebel, Fletcher, Rawlinson